# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

DAVID TYLER HILL,

               Plaintiff,

v.

BRENT REINKE, SHANE EVANS, JANE DOE I, JANE DOE II, CORIZON (a/k/a CORRECTIONAL MEDICAL SERVICES), RANDY BLADES, VICKI HANSEN, SHANNON BLACKBURN, RICHARD CRAIG, and CLAUDIA LAKE,

               Defendants.

Case No. 1:13-cv-00038-BLW

**MEMORANDUM DECISION AND ORDER**

Plaintiff David Tyler Hill, a prisoner in the custody of the Idaho Department of Correction (IDOC), is proceeding pro se and in forma pauperis in this civil rights action. Pending before the Court are Defendant Corizon's Motion for Summary Judgment (Dkt. 34); Defendants Brent Reinke's, Shane Evans's, Randy Blades's, Vicky Hansen's,

Shannon Blackburn's and Richard Craig's Motion for Summary Judgment (Dkt. 37) [1];

Plaintiff David Hill's Motion to Amend Complaint (Dkt. 40) and his Motion for Judicial

Notice (Dkt. 42); the IDOC Defendants' Motion to Strike, in which Defendant Corizon

joins (Dkt. 44); Plaintiff Hill's Motion to File a Response to Motion (Dkt. 48); and

Plaintiff Hill's renewed motion for appointment of counsel (Dkt. 50).

Having fully reviewed the record, the Court finds that the facts and legal

arguments are adequately presented in the briefs and record and that the decisional

process would not be significantly aided by oral argument. Accordingly, the Court will

decide this matter on the record without oral argument. D. Idaho L. R. 7.1. For the

reasons that follow, the Court concludes that there is no genuine dispute as to any

material fact and that Defendants are entitled to judgment as a matter of law. Therefore,

the Court will grant Defendants' Motion for Summary Judgment. All other motions are

denied as explained below.

## INTRODUCTION

The present lawsuit is the second lawsuit filed by plaintiff concerning the

treatment provided to him on C-Block, Tier Three, located within the Secure Mental

Health Unit (MHU) at Idaho Maximum Security Institution (IMSI) beginning on April

11, 2011. *See Hill v. Wamble-Fisher et al.*, Case 1:11-cv-00101-REB. This tier is known

as C-3. C-3 is a specialized mental health treatment unit, which is located within IMSI.

The unit is "designed to help identify an offender's acute mental health needs and to

---

[1]    Defendant Claudia Lake is alleged to be the Mental Health Unit's head psychologist and employed by Defendant Corizon to provide medical services at the IDOC. She was never served in this matter. It appears Plaintiff no longer desires to include Lake in his complaint, as he filed a motion to amend/correct that indicated he wished to "drop" her as a defendant. (Dkt. 40.) The individually named defendants will be referred to as the IDOC Defendants.

initiate appropriate treatment. Placement in C-3 is by referral only." (Eliason Aff. ¶ 8, Dkt. 34-3 at 3). The decision for an inmate to be admitted into C-3 is made by the IDOC mental health treatment team supervised and under the direction of psychologist Richard Craig. *Id.*

Defendant Richard Craig is the Chief Psychologist for the IDOC, and coordinates the care of patients at IMSI. *Id.* ¶ 7. In 2011, C-3 was staffed by a psychologist from the IDOC, Dr. Craig, and Corizon staff, which included two psychiatrists, a nurse practitioner, social workers, psychiatric technicians, and a mental health coordinator. *Id.* ¶ 10. Psychiatrist Scott Eliason was part of the treatment team in 2011 when Hill was housed at C-3. Dr. Eliason describes the treatment and behavioral system in C-3 as follows:

> Offenders are expected to take all prescribed medications and respect all staff and treatment team members as well as other offenders. They are also expected to follow the directions of the treatment and custody staff and the Idaho Department of Correction's rules and regulations.
>
> ***
>
> All offenders entering the Mental Health Unit are initially placed on Tier 3. Offenders housed in C-3 are subject to a level system that was designed to keep them and staff safe and secure. Levels are assigned based on offender behaviors, security risk, level of functioning, program compliance, treatment participation and psychiatric presentation. There are four levels with Level 1 being the most restrictive and, non-level, the least restrictive. Level 2 does not allow personal property, which includes reading books, photo albums, bibles, personal letters and paper, although legal paperwork is allowed. Phone privileges and access to security pens and writing paper are coordinated by treatment team staff.

Offenders are not allowed any contact with other offenders. Showers and linen exchanges are done on schedule.

Level status is discussed by the treatment team on a weekly basis and adjusted depending upon an offender's behavior, progress with treatment, and participation for the prior week. If an offender has not engaged in any disruptive, aggressive or threatening behavior, has been compliant with his treatment plan, which includes medication adherence, and establishes appropriate activities of daily living, then their offender level could be assessed for moving to a less restrictive level.

*Id.* ¶ 10-12.

Hill alleges that Defendants violated his Eighth Amendment rights to be free from cruel and unusual punishment, and to adequate mental health care during his time in C-3, as well as his Fourteenth Amendment right to due process by transferring him to C-3 without a hearing.

## PLAINTIFF'S MOTION TO AMEND COMPLAINT

Hill filed a motion to amend his complaint on May 29, 2014. He proposes to correct the misspelled names of the Defendants; identify the Doe Defendants; dismiss Defendant Claudia Lake; dismiss his due process claim; include additional factual details against Corizon; and explain the injunctive relief he is seeking. (Dkt. 40.)

The Court's case management order, entered on September 18, 2013 (Dkt. 27), required the parties to amend pleadings and join parties within 90 days after entry of the scheduling order, and for discovery to be completed within 150 days. Dispositive motions were due within sixty days after the close of discovery, and were timely filed by Defendants on April 15 and 16, 2014. Defendants oppose Hill's motion on the grounds

that it was untimely made, citing Fed. R. Civ. P. 16(b). Hill contends he was unaware of Rule 16(b)'s requirements.

Motions to amend a pleading filed after the scheduling order deadline has expired are governed by the restrictive provisions of Fed. R. Civ. P. 16(b), which require a showing of "good cause." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 608 (9th Cir. 1992). A court should find good cause only if the moving party shows he "could not reasonably meet the established timeline in a scheduling order despite [his] diligence." *DIRECTV, Inc. v. Busdon*, No. CV–04–265–S–LMB, 2005 WL 1364571, at * 1 (D. Idaho June 8, 2005). Rule 16 was designed to facilitate more efficient disposition of cases by settlement or by trial. *Johnson*, 975 F.2d at 610–11. If disregarded, it would "undermine the court's ability to control its docket, disrupt the agreed-upon course of the litigation, and reward the indolent and the cavalier." *Id.*; *see also* Rule 16 Advisory Committee Notes (1983 Amendment). The moving party's diligence governs the good cause standard. *Johnson*, 975 F.2d at 608. "When determining whether to grant a motion to amend a scheduling order, a court may also consider "the existence or degree of prejudice to the party opposing the modifications." *Id*. But if the moving party "was not diligent, the inquiry should end." *Id*.

Here, the only grounds Hill cited in support of his motion were his general unawareness of Rule 16(b)'s requirements, and his desire to remedy the technical requirements of his complaint in light of Defendants' motions for summary judgment. The Court is mindful that Hill is proceeding pro se and is incarcerated. "Pro se prison inmates, with limited access to legal materials, occupy a position significantly different

from that occupied by litigants represented by counsel." *Jacobsen v. Filler*, 790 F.2d 1362, 1365 n. 4 (9th Cir. 1986) (citation omitted). Courts have a duty to liberally construe the pleadings of pro se litigants, particularly those filed by pro se prisoners. *See Zichko v. Idaho*, 247 F.3d 1015, 1020 (9th Cir. 2001). But, pro se litigants are nonetheless bound by "the same rules of procedure that govern other litigants," *King v. Atiyeh*, 814 F.2d 565, 567 (9th Cir. 1987), including Rule 16(b)'s requirements.

The Court can discern no good cause based upon Hill's rationale that he will correct deficiencies in his Complaint. First, he proposes to add defendants by naming the Doe Defendants. Hill has offered no explanation why those defendants could not have been named earlier. Next, he proposes to "add" factual information. But, Hill has not offered any legitimate reason why he could not have included these facts prior to the deadline for amending pleadings. And finally, granting Hill's motion would unfairly prejudice Defendants in this matter, given that discovery is now closed and Defendants have timely filed their respective motions for summary judgment.

The Court is therefore not inclined to amend its case management order considering the lack of good cause to do so and Hill's neglect in proposing to file his proposed amended complaint after the deadline. The motions for summary judgment will therefore proceed based upon the initial Complaint filed in this matter, and the Motion to Amend will be denied.

However, the Court will construe Hill's motion to amend as a motion to dismiss Defendant Claudia Lake. Lake was never served with the original complaint, and Hill has not continued to prosecute this matter against her. *See* Response brief at 2 (Dkt. 39 at 2)

(indicating Lake has not been served). Lake may be dismissed from this action for failure to comply with Fed. R. Civ. P. 4(m). Further, Hill's motion explains he intends to "drop" Lake from his complaint. Accordingly, Defendant Claudia Lake will be dismissed from this action.

## PLAINTIFF'S MOTION TO TAKE JUDICIAL NOTICE

Hill requests the Court to take judicial notice of Idaho Code §§ 66-326, 335, and 1301-1318. Hill argues the statues are relevant and applicable to his complaint, because the Idaho Secure Medical Facility constitutes a "Mental Health Unit" covered by the statutes. Defendants oppose Hill's motion for judicial notice, asserting that Idaho statutes are not proper "adjudicative facts" to which Fed. R. Evid. 201 applies. Defendant further asserts that the Idaho code sections cited are irrelevant to Hill's federal constitutional claims.

Title 66, Chapter 3 of Idaho Code applies to govern the voluntary or involuntary admittance of mentally ill individuals, including prisoners, to any public or private hospital designated as a covered "facility" pursuant to board of health and welfare rules and regulations. Idaho Code §§ 66-317(7), 66-315. Hill did not identify any violations of state law in his complaint. Nor has Hill provided evidence, beyond his own speculation, that the acute mental health unit at IMSI constitutes a "facility" as defined by Idaho Code § 66-371(7). Moreover, the Idaho code sections cited are irrelevant to the federal constitutional claims alleged in Hill's complaint and allowed to proceed pursuant to the Court's Initial Review Order (Dkt. 3.) Finally, violation of state law does not lead to liability under Section 1983. *Campbell v. Burt*, 141 F.3d 927, 930 (9th Cir. 1998).

Hill's motion will therefore be denied.

## PLAINTIFF'S MOTION TO FILE OBJECTION TO REPLIES

Hill explains in his third motion that he does not wish to file a sur-reply to Defendants' reply memorandums filed in support of their motions for summary judgment, but rather to object to the untimely and late-filed reply memorandums. Hill argues that, because Defendants objected to his late filed response brief, he should be permitted the opportunity to object to Defendants' untimely reply briefs and have them stricken from the record. Defendants do indeed complain that Hill filed his response brief late. The Court will therefore address the relative timeliness of the briefs as they pertain to Defendants' motions for summary judgment.

Corizon timely filed its motion for summary judgment on April 15, 2014, (Dkt. 34), and the IDOC Defendants timely filed their motion for summary judgment on April 16, 2014, (Dkt. 37).[2] Because of the interplay among Fed. R. Civ. P. 5, 6, and Dist. Idaho L. Rule 7.1, a party has twenty-one days, plus an additional three days, within which to file a response brief. Thus, Hill's response to Corizon's Motion was due Friday, May 9, 2014, and his response to IDOC Defendant's motion was due Monday, May 12, 2014. Hill's "objection" to Defendants' motions for summary judgment is dated May 16, 2014, and was received by the Court and filed on May 20, 2014. (Dkt. 39.) Hill's response brief was therefore untimely.

---

[2]    The Court's Order required the parties to file all motions for summary judgment within 60 days after the close of discovery, which was February 15, 2014 (150 days from September 18, 2013, the date of the Scheduling Order). Thus, the last day upon which to file a motion for summary judgment was April 16, 2014.

Defendants' reply briefs were due within seventeen days (14 days plus an additional 3 days) after service of Hill's (tardy) response brief. Dist. Idaho L. Rule 7.1(b)(3); Fed. R. Civ. P. 5, 6. That deadline expired on Monday, June 2, 2014. Defendants' respective replies were indeed filed late, on June 3, 2014, and June 5, 2014. (Dkt. 43, 45.) Reply briefs are, however, optional under Dist. Idaho L. Rule 7.1(b).

The Court sees no reason to strike any party's brief on the grounds of untimeliness under the circumstances. While the Court does not condone lackadaisical adherence to generally applicable procedural rules, the Court cannot grant a motion for summary judgment solely because the opposing party has failed to file an opposition, or in this case, a tardy opposition that Defendants seek to have this Court ignore as if never filed. *Cristobal v. Siegel*, 26 F.3d 1488, 1494-95 & n.4 (9th Cir. 1994) (unopposed motion may be granted only after the court determines there are no material issues of fact); *see also United States v. Real Property at Incline Village*, 47 F.3d 1511, 1520 (9th Cir. 1995) (local rule cannot mandate automatic entry of judgment for moving party without consideration of whether motion and supporting papers satisfy Fed. R. Civ.P. 56), *overruled on other grounds by Degen v. United States*, 517 U.S. 820, 116 S.Ct. 1777, 135 L.Ed.2d 102 (1996); *see also Marshall v. Gates*, 44 F.3d 722, 725 (9th Cir. 1995) (summary judgment may not be granted simply because opposing party violated a local rule, if movant did not meet burden of demonstrating absence of genuine issue for trial).

Thus, the Court must still determine if Defendants have met their burden. Consideration of Hill's arguments and the relevant authority cited in that regard will aid the Court, as will Defendants' respective reply briefs. Although the Court would be well

within its authority to not consider Hill's response brief or defendants' replies, in the exercise of its discretion, and in light of Ninth Circuit authority, it declines to do so here and will reach the merits of the summary judgment motions giving consideration to Hill's arguments advanced in his response brief, and Defendants' arguments in their reply briefs. Therefore, Plaintiff's motion will be denied as moot.

## PLAINTIFF'S MOTION FOR APPOINTMENT OF COUNSEL

Unlike criminal defendants, prisoners and indigents in civil actions have no constitutional right to counsel unless their physical liberty is at stake. *Lassiter v. Dept. of Social Services*, 452 U.S. 18, 25, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). Whether a court appoints counsel for indigent litigants is within the court's discretion. *Wilborn v. Escalderon*, 789 F.2d 1328, 1330–31 (9th Cir. 1986); *Terrell v. Brewer*, 935 F.2d 1015, 1017 (9th Cir. 1991).

The Court finds none of the factual information contained in Hill's new Motion shows that the earlier decision denying appointment of counsel should be disturbed. *See* Order (Dkt. 32).[3] Hill generally cites the difficulties he has had conducting discovery, contending that Defendants have failed to "reveal" information relevant to Hill's claims in their respective initial disclosures. But, nothing prevented Hill from propounding his own discovery, which would have allowed Hill to draft and serve written discovery upon Defendants relevant to his claims and thereby obtain the documents he complains are in

---

[3] Defendants also generally oppose Hill's motion because Hill now has more than three outstanding motions, contravening the Court's order prohibiting any party from having more than three pending motions before the Court at one time. Order (Dkt. 8.) Although Defendants are correct, and violation of the Court's order would be sufficient grounds to deny Hill's motion for appointment of counsel, the Court nevertheless considered the merits given the context and the issues raised.

Defendants' custody and control. Second, Hill asserts he is having difficulty in presenting his response to Defendants' motions for summary judgment, contending he is unable to present the evidence properly before the Court in light of Defendants' motion to strike. Hill further contends he has no access to the relevant law, which appointment of counsel would alleviate.

There is no doubt that it is difficult to litigate from a prison cell and that pro se individuals do not have the legal training or resources to do what they could if they were lawyers or had lawyers. However, prisoner status and lack of legal expertise are not enough to warrant appointment of counsel. Here, Hill's inability to more fully litigate his claims is an "incidental (and perfectly constitutional) consequence[] of conviction and incarceration." *Lewis v. Casey*, 518 U.S. 343, 355, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). Accordingly, Hill's Motion for Appointment of Counsel will be denied.

## DEFENDANTS' MOTION TO STRIKE

The Court has reviewed the motion to strike filed by IDOC Defendants, and joined by Defendant Corizon, directed at Hill's affidavit and various other submissions filed in opposition to Defendants' summary judgment motions. (Dkt. 44.) In addition to the untimeliness of Hill's submissions, the Court finds the remaining contested portions of the affidavit and other documents are not relevant to resolving the motions for summary judgment. While the contested statements are speculative and based upon hearsay, and the documents lack the requisite foundation, the Court has determined it need not consider the contested portions of the Affidavit of David Beckett or the Affidavit of Tyler

Hill, as well as Exhibits A, B, D, H, and K attached thereto. The motion to strike will be denied as moot.

## DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

**1.      Factual Background**

This section includes facts that are undisputed and material to the resolution of the issues in this case. Where material facts are in dispute, the Court has included Plaintiff's version of facts, insofar as that version is not contradicted by clear documentary evidence in the record. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.")

Corizon is a private corporation under contract to provide medical services to inmates in the custody of certain Idaho Department of Correction facilities. Corizon contracts with medical doctors and other care providers who provide care to inmates in the custody of IDOC facilities.

Dr. Richard Craig is the Chief Psychologist for the IDOC, and Corizon staff members who were part of the treatment team at IDOC included psychiatrist Dr. Scott Eliason, psychologist Claudia Lake, and psychiatric technicians Micaela Cathey and Julie Keller. Dr. Eliason assisted in the development of treatment plans and coordinated the care of patients with Dr. Craig and the treatment team. Dr. Eliason was personally involved with the care and treatment provided to Hill while incarcerated at IMSI in April and May of 2011. Eliason Aff. ¶ 6 (Dkt. 34-3.) Dr. Eliason authenticated Hill's medical

records from his stay at IMSI, and submitted them attached to his affidavit. Eliason Aff. Ex. A (Dkt. 34-3).

IMSI's MHU is generally referred to as IMSI's C-block, which is comprised of two tiers: Tier 2 (C-2) and Tier 3 (C-3). C-2 is less restrictive, focusing on providing group therapy and education to prisoners who have moved through the level system while housed in C-3 and established compliance with their individualized treatment plan and with appropriate activities of daily living. Upon arriving at the MHU unit, prisoners were placed in C-3, so that staff could identify the individual prisoner's acute mental health needs and initiate appropriate treatment. Aff. of Bennett ¶ 5, 6 (Dkt. 37-3 at 2). Prisoners housed in C-3 were given a green jumpsuit, underwear, t-shirt, socks, shower shoes and canvas tennis shoes, as well as hygiene items as needed. *Id.* ¶ 7.

Hill was confined to the MHU from April 11, 2011, to May 27, 2011. Defendant Richard Craig ordered the transfer from ICC upon referral from social worker Alexander Black. Eliason Aff. ¶ 13. Black evaluated Hill on April 11, 2011, noting that Hill had been admitted to the medical observation cell four times since March 20, 2011, for cutting on himself, thoughts of suicide, anxiety, and depression. Black noted that the reason for referral was due to continued instability of moods and inability to manage depression and anxiety. At the time he was admitted, Hill had self-inflicted a superficial wound on his right inner thigh, and for that, he was placed in an isolation cell for observation for 23 hours. (Dkt. 34-4 at 10.) Black's notes reflect that he observed Hill, who appeared as if he had not slept, had dark circles under his eyes, and moved slowly. Black noted that Hill had a flat affect and his voice lacked emotion. Hill was thereafter

placed on C-3. Although Hill denied any suicidal intent, hallucinations or delusions at the time, Hill indicated to Black that, if given the opportunity, Hill would engage in self-harm. (Dkt. 34-4 at 7.) In Dr. Craig's opinion, an emergency condition existed on April 11, 2011. Aff. of Craig ¶ 17 (Dkt. 37-4 at 6.) Prior to his admittance to MHU, Hill had been seeing mental health clinicians twice weekly, and had not been compliant with his behavior contract. (Dkt. 37-5 at 9.

Hill signed a consent for treatment form on April 11, 2011, authorizing Correctional Medical Services employees to diagnose and treat him. (Dkt. 34-4 at 2.) On that date, IMSI's intake form indicated Hill was diagnosed with Bipolar disorder and depression. (Dkt. 34-4 at 3.) Black also noted Hill was currently taking Paxil and Elavil. Eliason Aff. ¶ 13.

Hill next underwent an intake mental health screening on April 12, 2011, which was reviewed on April 14, 2011, by Claudia Lake, Psy.D. Eliason Aff. ¶ 13. Dr. Lake made a mental health referral and scheduled Hill to be seen by Dr. Eliason on April 19, 2011. *Id.* ¶ 15. Medication orders for Elavil and Paxil were continued, and Hill was then released from segregation on April 13, 2011. *Id.* ¶ 15. Dr. Lake, in conjunction with other treatment team members Micaela Cathey and Julie Keller, created a thirty day treatment plan on April 14, 2011. *Id.* ¶ 16. (Dkt. 34-4 at 16.) The treatment plan noted the reason for Hill's referral to IMSI C-Block was due to his decrease in coping skills, increase in suicidal ideation, and behavioral issues. *Id.* The plan indicated the short term goal for Hill was to display appropriate behavior and medication compliance, with a long term goal of moving to a less restrictive environment. Hill did not agree with the treatment plan.

During the treatment plan review, Hill became argumentative and threatened to hang himself. Hill was moved to medical and placed on suicide watch. (Dkt. 34-4 at 18.)

IDOC clinician Vicki Hansen evaluated Hill and performed a suicide risk assessment on April 14, 2011. (Dkt. 34-4 at 14.) In her report, she noted Hill was currently housed in the medical holding cell at IMSI. Hansen noted that his past diagnoses included several Axis I disorders of Bipolar mood disorder, and depression. Hill was referred for assessment because he threatened to harm himself, believed he should be living on C-2 and not C-3, and staff had observed him beginning to tear up his sheets. During the assessment, Hill stated that he refused to be returned to C-3. Hanson's review of psychological factors noted Hill was adamant he would be determining his own housing. Although Hanson questioned Hill's intent to die, Hanson assessed Hill as having a high risk for suicide.

The next day, on April 15, 2011, Vicki Hansen again assessed Hill for suicide risk. (Dkt. 34-4 at 20.) During the interview, Hill reported he was cold, and he was no longer threatening self-harm or demanding to determine his housing. Hansen determined Hill was a low suicide risk, and observed Hill as being more subdued than the prior day. Hanson recommended Hill be reduced to close observation and kept in medical over the weekend.

On April 18, 2011, Hill completed a Health Services Request (HSR) seeking medication for his eczema. Hill was seen for that complaint on April 19, 2011 and received instructions regarding how to apply the prescription ordered for him.

On April 19, 2011, Dr. Eliason personally assessed Hill. (Dkt. 34-4 at 22.) During Dr. Eliason's examination, Hill reported eating well and being concerned about the side effects from Elavil. Hill stated to Dr. Eliason that "I won't kill myself if they would just put me where I need to go." Dr. Eliason noted that the reason for Hill's referral to IMSI was because of Hill's threats of suicide, unless he was sent to the BHU. Dr. Eliason noted that Hill had been difficult to manage and he would attempt to get Hill off his medications to see how he did in order to improve the team's ability to accurately diagnose him. In Dr. Eliason's opinion, Hill's mood problems could be primarily Axis II, which is characterized by a personality disorder that would not be responsive to medication. Eliason Aff. ¶ 20. Personality disorders are characterized by rigid, inflexible, and maladaptive behavior patterns that impair an individual's ability to function in society, as well as in the correctional setting. *Id.* The plan was to taper Hill's medication (Paxil and Elavil), and have him return to clinic in three weeks. Dr. Eliason noted that the treatment plan was for medication and follow up only, with the short-term goal being medication compliance and the long term goal to improve Hill's ability to function in a less restrictive environment. (Dkt. 34-4 at 22.)

The MHU Treatment Team met on April 19, 2011, as well. Treatment team notes indicate Hill was housed at C-3 on level 2 status, and was in medical. On April 26, 2011, staffing notes indicate Hill had written on the walls with food, and cut his wrists after returning from the shower. (Dkt. 34-5 at 25.)

On April 29, 2011, at Hill's request, Micaela Cathey submitted a Health Service Request Form to address Hill's complaints of back pain. Bruce Cooper, CMS, evaluated

Hill on May 2, 2011. (Dkt. 34-5 at 1.) Hill submitted another Health Service Request Form on May 1, 2011, requesting his topical ointments prescribed for his eczema be provided to him at pill call that evening. (Dkt. 34-5 at 4.) The response to Hill's request indicated the medication had been ordered.

Staff notes from C-Block on May 3, 2011, reflect Hill had regular level 2 status. (Dkt. 34-5 at 26.) It was noted Hill did not need medication, and that Dr. Lake would be performing tests and considering whether to discharge Hill from the unit.

On May 6, 2011, technician Micaela Cathey evaluated Hill to follow up on Hill's complaints about his placement in C-Block and his complaint that he was taken off his medications. Cathey noted that Hill stated, "I won't be here much longer. I'm not going to kill myself or anything but you guys took me off my meds and the thoughts are there." (Dkt. 34-5 at 6.) Cathey noted also that Hill presented with an appropriate affect and was clear speaking, and that Hill was attempting to rile up staff.

On May 9, 2011, Vicki Hansen evaluated Hill for suicide risk, determining that it was low. (Dkt. 34-5 at 8.) It was noted that Hill stated he was suicidal to "get off the tier," but retracted that statement after being taken to medical. He was placed on suicide watch at that time. Hansen determined Hill's status would be changed to close observation and Hill would be kept in the medical unit. Following Hansen's visit with Hill, Hill found a screw in his quarters and used it to superficially scratch his leg. Hill was then moved to another medical cell for closer observation.

On May 10, 2011, Dr. Eliason evaluated Hill because of his continued behavioral problems. (Dkt. 34-5 at 10.) Hill indicated he had found a screw while he was in the

medical unit and used it to scratch on his leg. At that time, Hill was dressed in a suicide smock. Hill claimed he was not eating well, had low energy and was depressed to the point that he could not read a newspaper without crying. But Dr. Eliason's notes indicated Hill did not have access to a newspaper, staff reported Hill was eating well, and Hill appeared to be misreporting his symptoms. Dr. Eliason's examination reported Hill's behavior was not indicative of an active mood episode, and noted Hill's suicidal threats appeared primarily to be made to control his environment. (Dkt. 34-5 at 10.) Nevertheless, Dr. Eliason ordered that Paxil be restarted, because it might calm down Hill's impulsivity and irritability and help Hill's Axis II pathology to not be quite as bad. Dr. Eliason's treatment plan was again for medication and follow-up only.

The weekly staffing minutes dated May 10, 2011, indicated Hill was in medical and was going back on anti-depressants. (Dkt. 34-5 at 27.) It was noted Hill would be sent to segregation and remain in medical until discharge. Dr. Craig ordered a behavior plan to be prepared, as it was apparent to Dr. Craig that Hill would not succeed in the MHU because Hill would not work through the C-3 levels. Aff. of Craig ¶ 43 (Dkt. 37-4 at 18.) According to Dr. Craig, because of Hill's behavior and apparent lack of mental illness, it appeared Hill would be more successful in an administrative setting with a behavioral plan to follow. *Id*.

On May 11, 2011, Vicki Hansen met with Hill, noting he had been on suicide watch since May 9, 2011, after threatening self-harm. (Dkt. 34-5 at 11.) During their meeting, Hill provided a list of institutions in which he demanded to be housed. It was determined at the meeting that Hill would have to remain on suicide watch because of his

behavior cutting on himself with the screws he found in his cell. At one point during the evaluation, Hill became verbally abusive to Hansen. He was later escorted back to his quarters. Hansen recommended Hill continue on suicide watch with daily follow up until released. Hansen also indicated she would follow up with Dr. Claudia Lake regarding discharge from C-3.

Psychology technician Cathey met with Hill on May 12 and 17, 2011, but reported no new information regarding Hill's mental health condition. The May 17, 2011, weekly staffing meeting minutes reflect Hill was still in medical; that Dr. Lake was working on preparing a behavior plan and discharge; and that Hill was not an appropriate candidate for C Block. (Dkt. 34-5 at 28.)

On May 24, 2011, Dr. Lake met with Hill and completed a discharge summary. At the time of discharge, Dr. Lake was of the opinion that Hill had an Axis II diagnosis of "personality disorder with borderline features." (Dkt. 34-5 at 16.) She noted that since Hill's arrival at IMSI, Hill had "continued to use self-harming behavior as a means to cope and deal with his environment, as well as a form of manipulating placement and staff." In relation to his return to IMSI in April of 2011, Dr. Lake noted the following:

> Mr. Hill returned to IMSI in April of 2011. Since this time, he has been placed in the medical unit for suicidal threats and self-harming behavior on three occasions and is currently housed there. Mr. Hill has not been cooperative with the policies and treatment plan on C-3. He remains aggressive with staff and has flooded mental health and custody staff with letters, grievances, and concern forms attempting to force his placement at ISCI BHU. During his stay at IMSI he has not displayed any signs of depression, anxiety, or mental illness. He demands treatment for Borderline Personality Disorder and yet does not provide any attempt at cooperating with any treatment and behavioral options. . . . Discussion with psychiatry and at the 5/17/11 staffing concluded that placement in a secured

> environment with a behavior plan may control his acting out behavior and
> prepare him for a GP setting, which is the most appropriate placement for
> an individual without an Axis I disorder.

Dr. Lake determined that Hill's behavior, lack of mental illness, and aggressiveness made placement in C-3 inappropriate.

In Dr. Eliason's opinion, based upon his education, training, and experience, and his personal knowledge of Hill's mental condition, the care and treatment provided to Hill at IMSI in April and May of 2011 was a reasonable and appropriate course of action. Eliason Aff. ¶ 32 (Dkt. 34-3 at 13).

## 2. Summary Judgment Standard

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment rule "is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is not "a disfavored procedural shortcut," but is instead the "principal tool[] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Rather, there must be no genuine dispute as to any material fact in order for a case to survive summary judgment. Material facts are those "that might affect the outcome of the suit." *Id*. at 248. "Disputes over irrelevant or unnecessary facts

will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987).

The moving party is entitled to summary judgment if that party shows that each material fact cannot be disputed. To show that the material facts are not in dispute, a party may cite to particular parts of materials in the record, or show that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A) & (B). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3). The Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (internal quotation marks omitted). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *So. Ca. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

If the moving party meets this initial burden, then the burden shifts to the opposing party to establish that a genuine dispute as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

Material used to support or dispute a fact must be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Affidavits or declarations submitted in support of or in opposition to a motion "must be made on personal knowledge, set out

facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). If a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the Court may consider that fact to be undisputed. Fed. R. Civ. P. 56(e)(2). The Court will grant summary judgment for the moving party "if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party. Although all reasonable inferences that can be drawn from the evidence must be drawn in a light most favorable to the non-moving party, *T.W. Elec. Serv., Inc.*, 809 F.2d at 630-31, the Court is not required to adopt unreasonable inferences from circumstantial evidence, *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

**3.      Section 1983 Standard**

Plaintiff brings his claims under 42 U.S.C. § 1983, the civil rights statute. To succeed on a claim under § 1983, a plaintiff must establish a violation of rights protected by the Constitution or created by federal statute proximately caused by the conduct of a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). Prison officials are generally not liable for damages in their individual capacities under § 1983 unless they personally participated in the alleged constitutional violations. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *see also Ashcroft v. Iqbal*, 556 U.S.

662, 677 (2009) ("[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct.").

"A defendant may be held liable as a supervisor under § 1983 'if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)). This causal connection "can be established by setting in motion a series of acts by others, or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury." *Id*. at 1207-08 (internal quotation marks, citation, and alterations omitted).

### 4.    Standard of Law for Eighth Amendment Claims

The Eighth Amendment to the United States Constitution protects prisoners against cruel and unusual punishment. To state a claim under the Eighth Amendment, a prisoner must show that he is "incarcerated under conditions posing a substantial risk of serious harm," or that he has been deprived of "the minimal civilized measure of life's necessities" as a result of Defendants' actions. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). An Eighth Amendment claim requires a plaintiff to satisfy "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012).

The Eighth Amendment includes the right to adequate medical care in prison, and prison officials or prison medical providers can be held liable if their "acts or omissions [were] sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). The Eighth Amendment right to adequate prison health care includes adequate mental health treatment, and the standards are the same whether the treatment is considered physical or mental. *Doty v. County of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994).

Regarding the objective standard for prisoners' medical care claims, the Supreme Court of the United States has explained that "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

The Ninth Circuit has defined a "serious medical need" in the following ways:

> failure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain[;] . . . [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain . . . .

*McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992) (internal citations omitted), overruled on other grounds, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).

As to the subjective standard, a prison official or prison medical provider acts with "deliberate indifference . . . only if the [prison official] knows of and disregards an

excessive risk to inmate health and safety." *Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1175, 1187 (9th Cir. 2002) (citation and internal quotation marks omitted). "Under this standard, the prison official must not only 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting Farmer, 511 U.S. at 837).

"If a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk." *Gibson*, 290 F.3d at 1188 (citation omitted). However, "whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842; *see also Lolli v. County of Orange*, 351 F.3d 410, 421 (9th Cir. 2003) (deliberate indifference to medical needs may be shown by circumstantial evidence when the facts are sufficient to demonstrate that defendant actually knew of a risk of harm). Deliberate indifference can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104-05 (footnotes omitted).

Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish deliberate indifference. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). "[T]o prevail

on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk' to the prisoner's health." *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004) (alteration omitted) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

Mere indifference, medical malpractice, or negligence will not support a cause of action under the Eighth Amendment. *Broughton v. Cutter Labs*., 622 F.2d 458, 460 (9th Cir. 1980) (per curiam). A delay in treatment does not constitute a violation of the Eighth Amendment unless the delay causes further harm. *McGuckin*, 974 F.2d at 1060. Summary judgment is appropriate if medical personnel have been "consistently responsive to [the inmate's] medical needs," and there has been no showing that medical personnel had "subjective knowledge and conscious disregard of a substantial risk of serious injury." *Toguchi*, 391 F.3d at 1061.

## 5.     Standard of Law Applicable to Fourteenth Amendment Claims

Other than claims involving a property interest—which are not at issue here—only claims involving a "liberty interest" are actionable under the Due Process Clause of the Fourteenth Amendment. Because liberty interests are "generally limited to freedom from restraint," a prisoner asserting a due process claim must show that he has suffered an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). In *Sandin*, the Supreme Court held that, in order for a district court to determine whether there is such a liberty interest, it must analyze three factors: (1) whether disciplinary segregation was essentially the same as

discretionary forms of segregation; (2) whether a comparison between the plaintiff's

confinement and conditions in the general population showed that the plaintiff suffered

no "major disruption in his environment"; and (3) whether the length of the plaintiff's

sentence was affected. *Id*. at 486-87.

In *Wilkinson v. Austin*, 545 U.S. 209 (2005), the United States Supreme Court

underscored the severity of the conditions required to meet the liberty interest test:

> For an inmate placed in OSP, almost all human contact
> is prohibited, even to the point that conversation is not
> permitted from cell to cell; the light, though it may be
> dimmed, is on for 24 hours; exercise is for 1 hour per day, but
> only in a small indoor room. Save perhaps for the especially
> severe limitations on all human contact, these conditions
> likely would apply to most solitary confinement facilities, but
> here there are two added components. First is the duration.
> Unlike the 30-day placement in *Sandin*, placement at OSP is
> indefinite and, after an initial 30-day review, is reviewed just
> annually. Second is that placement disqualifies an otherwise
> eligible inmate for parole consideration. While any of these
> conditions standing alone might not be sufficient to create a
> liberty interest, taken together they impose an atypical and
> significant hardship within the correctional context. It follows
> that respondents have a liberty interest in avoiding
> assignment to OSP.

*Id*. at 223-24 (citations omitted).

"[T]he stigmatizing consequences of a transfer to a mental hospital for involuntary

psychiatric treatment, coupled with the subjection of the prisoner to mandatory behavior

modification as a treatment for mental illness, constitute the kind of deprivations of

liberty that requires procedural protections."). *Vitek v. Jones*, 445 U.S. 480, 494 (1980)

"Segregation of a prisoner without a prior hearing may violate due process if the

postponement of procedural protections is not justified by apprehended emergency conditions." *Hughes v. Rowe*, 449 U.S. 5, 11 (1980).

6.      **Analysis**

        A.      ***Defendant Corizon***

To succeed on his claims against Corizon as an entity, Hill must meet the test articulated in *Monell v. Dep't of Social Services*, 436 U.S. 658, 690-94 (1978); *see Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) (applying *Monell* to private entities). Under *Monell*, the requisite elements of a § 1983 claim against a municipality or private entity performing a state function are the following: (1) the plaintiff was deprived of a constitutional right; (2) the municipality or entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001). An unwritten policy or custom must be so "persistent and widespread" that it constitutes a "permanent and well settled" practice. *Monell*, 436 U.S. at 691 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-168 (1970)). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

Hill has failed to present facts indicating a basis for holding Corizon liable for a violation under the Eighth Amendment and the standard articulated in *Monell*. Hill has not presented evidence of any Corizon custom or policy that caused his alleged injuries.

The undisputed facts indicate the policy for treatment at C-3 was developed by IDOC, not Corizon. And, Corizon does not itself provide medical care. Rather, its contracted physicians and medical care providers dispensed medical care. Finally, Hill admits in his brief that he cannot challenge Corizon's motion for summary judgment. (Dkt. 39 at 2.) Therefore, summary judgment will be granted to Corizon.

## B.    IDOC Defendants[4]

### (1)    Conditions of Confinement

In his complaint, Hill alleged that he received inadequate out-of-cell time, that the suicide watch cells are dirty, ant infested, unsanitary, and cold, and that he was permitted to shower only three times per week. Hill further alleges that the conditions in the suicide watch cells are unconstitutional because prisoners are exposed to bright lighting 24 hours per day, and inmates are stripped nude and given a smock suit or suicide blanket with paper underwear. Hill alleges also that the behavioral modification system, or level system, is unconstitutional.

Hill has not presented evidence that any of the IDOC Defendants knew of and disregarded an excessive risk to Hill's health or safety by knowingly denying him humane conditions of confinement. First, there is no evidence Hill's concerns about his cell conditions were ever voiced. Hill submitted several offender concern forms while in

---

[4]    IDOC Defendants argue that Hill's claims must be dismissed in their entirety under the Prison Litigation Reform Act, 42 U.S.C. § 1997e(e), because Hill has not alleged or shown any physical injury, citing *Oliver v. Keller*, 289 F.3d 623, 627 (9th Cir. 2002). However, *Oliver* does not so hold. Rather, *Oliver* holds that a prisoner may not seek damages for emotional injury unless the prisoner has suffered more than a *de minimus* physical injury. But, Section 1997e(e) does not bar actionable claims for compensatory, nominal or punitive damages premised upon violation of one's constitutional rights, and not on any alleged mental or emotional injuries. *Oliver*, 289 F.3d at 630. Hill seeks compensatory damages for violation of his Eighth and Fourteenth Amendment rights. Therefore, Section 1997e(e) does not bar Hill's claims.

the MHU, none of which complained about the conditions of his confinement. All of his offender concern forms were addressed by IDOC staff members. The absence of any concern forms addressing the alleged unsanitary, dirty, ant infested, cold, or other conditions of which Hill complains equate to a lack of any facts suggesting that any IDOC Defendants were aware Hill was placed in a dirty or unsanitary cell and then acted with deliberate indifference to this condition.

While Hill did claim he was placed in a suicide watch cell on one occasion when the cell was cold and he was provided inadequate clothing, Hill failed to submit any evidence that the IDOC Defendants were personally aware of that condition and were deliberately indifferent to the same. Although Hill reported to Hansen on April 15, 2011, that he was cold, there is no evidence Hansen ignored his concern, or that Hill submitted an offender concern form to address the temperature in his cell. Rather, the evidence in the record does establish that when Hill submitted his concern forms, they were addressed. The lack of any concern forms about the conditions in the MHU Hill experienced indicates a lack of any evidence establishing Hill's Eighth Amendment claims.

Next, Hill has not supported his claim that his lack of out-of-cell-time was detrimental to his mental health condition while in MHU. The records establish that Hill's behavior while in MHU was difficult to manage, and his limited out-of-cell time was for Hill's personal safety and the safety of staff because of his continued suicide threats and self-harming behaviors. An Eighth Amendment violation does not arise when the short-term deprivation of certain basic necessities of life result from an emergency

situation. *See Anderson v. County of Kern*, 45 F.3d 1310, 1315 (9th Cir. 1995) ("[I]n an emergency, prison officials are not culpable when they put an inmate who imminently threatens or attempts suicide temporarily in a place where he cannot hurt himself."). The record indicates Hill had threatened suicide four times in the twenty-one day period before being transferred to the MHU, and that while there, he used objects to harm himself and continued to threaten suicide. Under the circumstances, the temporary deprivation of certain privileges, such as out-of-cell time or more frequent showers, does not constitute deliberate indifference to Hill's conditions of confinement.

In his brief, Hill claims his conditions of confinement were unconstitutional because the IDOC should have a "safe room" for the placement of suicidal inmates. But Hill's argument cannot pass muster. Hill has failed to present evidence that he was subjected to an unreasonable risk of safety while on suicide watch at the MHU, or that the lack of a safe room caused an unreasonable risk of safety.[5] The record indicates Hill was evaluated regularly while housed in the MHU and kept under observation for self-harming behaviors or suicidal ideation.

Hill fails also to present evidence that the level system created an inhumane condition of confinement. Hill argues that, because of his diagnosis of personality disorder, the level system as applied to him was cruel and unusual punishment. But Hill offers nothing more than mere speculation and his own opinion. Further, the medical

---

[5]    Nor does the Court believe Hill would actually want to be placed in a safe room. In *Anderson*, the safe room utilized for suicidal inmates consisted of a padded cell with a pit toilet covered by a grate, no furniture of any kind, and violent suicidal inmates were shackled over the pit toilet. *Anderson*, 45 F.3d at 1313. In that case, the court held the temporary use of a safety cell for placement of prisoners in response to severe safety concerns did not violate the Eighth Amendment.

team either met with Hill or checked in with him on a regular basis to determine his mental health status. There is therefore insufficient evidence to defeat IDOC's summary judgment motion on Hill's Eighth Amendment conditions of confinement claim.

### (2) *Mental Health Care*

Hill contends the IDOC Defendants were deliberately indifferent to his serious medical need because he was subjected to blanket behavioral modification treatment, which was insufficient to treat his borderline personality disorder, and he was not allowed access to programing, counseling, or other related mental health services except for the level system. However, while housed in the MHU, Hill was evaluated thirteen times, by Dr. Claudia Lake (4/14, 5/24), Dr. Scott Eliason (4/19, 5/10), psychology technician Micaela Cathey (4/21, 4/26, 5/6, 5/12, and 5/17), and by Vicki Hansen, M. Ed. (4/14, 4/15, 5/9, 5/11). Each provider performed an individual assessment of Hill's mental health condition as it existed at the time and attempted to engage Hill in his treatment.

These formal evaluations were in addition to the meetings of the members of his treatment team where Hill's behavioral and treatment plan were discussed. The treatment team meetings occurred weekly, on April 19 and 26, and May 3, 10, and 17. Additional evidence establishes that when Hill did not approve of his treatment, he threatened suicide and engaged in self-harm by cutting on himself with objects he found in his cell. He engaged in these behaviors in an apparent attempt to manipulate his cell placement. Thus, the evidence establishes that Hill refused to cooperate in his own mental health treatment, which caused him to be placed on suicide watch while at the MHU as a result of his own behavior choices.

There is also more than sufficient evidence that Dr. Eliason was treating Hill in a sufficient and medically acceptable manner. Dr. Eliason's treatment plan was to wean Hill off medication treating his depression, so the treatment team could better understand Hill's mental health diagnosis, thereby enabling the team to better treat his condition. This is in contrast to Hill's prior treatment plan developed on April 3, 2009, which was designed primarily to address Hill's behavior. *See* Supp. Aff. of Craig (Dkt. 46 at 8.) Hill's disagreement with his treatment plan recommended by his mental health treatment team and with the level system in C-3 was just that—a disagreement, which is not actionable under Section 1983. *See Sanchez*, 891 F.2d at 242. The burden thus shifts to Hill to raise a genuine issue that the level system and the behavioral and treatment plan were "medically unacceptable under the circumstances" or were "chosen in conscious disregard of an excessive risk" to Hill's mental health. *Toguchi*, 391 F.3d at 1058 (internal quotation marks omitted).

Hill has not met this burden. The IDOC Defendants dealt with Hill's behavior as best they could, responding to his threats of suicide and self-harm by placing Hill in the medical unit or on suicide watch. They assessed his status regularly as Hill was tapered off his medications. As a result of the treatment plan, Dr. Eliason ultimately determined Hill would not benefit from anti-depressant medications, and changed his diagnosis from Bipolar disorder to personality disorder. Staff attempted also to help Hill manage his behavioral and mental health issues. Although Hill claims he was subjected to the same treatment plan as all other individuals housed in C-3, the record refutes Hill's contention. Hill was offered an individualized treatment plan, focused on Hill's particular mental

health needs at the time of placement in the MHU. Hill, however, did not wish to follow it, and his own behavior (threats of suicide and self-harm) landed him in the suicide watch cells within the MHU. Hill has not shown that a genuine dispute of material fact exists, and the IDOC Defendants are entitled to summary judgment.

The Court briefly mentions IDOC Defendants Reinke, Evans, Blades, and Blackburn separately. Hill has failed to present evidence that any of these individuals personally participated in his medical care or had knowledge of and were deliberately indifferent to his serious medical needs. Hill's Section 1983 claims will be dismissed.

### (3) *Due Process*

Hill alleges that his right to due process was violated by the failure to provide a hearing prior to his transfer to the MHU. He also claims that being forced to participate in the mandatory behavioral modification program and having to take psychotropic drugs on a coerced-compliance basis violates due process.

The segregation of a prisoner without a prior hearing may violate due process if the postponement of procedural protections is not justified by apprehended emergency conditions. *Hughes v. Rowe*, 449 US 5, 11 (1980). Here, Hill's medical care providers were responding to emergency conditions that existed at the time. Hill had been transferred four times between March 20, 2011, and April 11, 2011, to the medical observation cell because of Hill's unstable moods and self-injurious behavior, as well as threats of suicide. Medical staff determined the need to transfer him to the MHU for further evaluation and treatment, both for Hill's safety and staff safety. Hill has not presented any evidence to contradict the facts in the record.

Hill contends the reasoning in *Hughes* is inapplicable under *Vitek v. Jones,* 445 U.S. 480 (1980), because the MHU is a "mental hospital" to which he was transferred. Hill claims this Court must determine whether the MHU is a mental hospital before it can rule on IDOC's summary judgment motion. But Hill's arguments are misplaced.

The holding in *Vitek* does not apply to the facts present here. In *Vitek*, the plaintiff was involuntarily transferred from the prison to a state agency run mental hospital that was not under the auspices of the department of corrections. 445 U.S. at 488. Additionally, the prisoner was transferred because of a mental health diagnosis that the prison could not treat, not because any emergency justified the transfer. *Id.* at 484. Under those circumstances, the United States Supreme Court held that the plaintiff's involuntary transfer to a mental hospital for the purpose of psychiatric treatment implicated a liberty interest protected by the Due Process Clause. *Id.* at 494.

Here, in contrast, Hill was not transferred to a state agency run mental hospital. Rather, the MHU is part of the department of corrections. The MHU is a part of an IDOC prison, IMSI, and over which the IDOC has custody and control. The MHU inmates were treated by medical care providers contracted by IDOC to provide care to IDOC inmates. And Hill was not transferred to the MHU because of a mental health diagnosis IDOC could not treat. Rather, Hill was transferred because his mental health had deteriorated to the point that care providers determined an emergency existed. The purpose of the transfer was clearly expressed, and was for the purpose of conducting diagnostic work to determine the nature of Hill's mental health diagnosis so as to provide better treatment to

him. Under those facts, *Vitek* does not control here, and Hill's due process rights were not violated on account of the transfer.

Next, Hill has not presented contrary facts to suggest that his treatment plan was anything other than specifically tailored to Hill's medical condition and needs at the time. The goals of Hill's treatment plan were to wean Hill from his anti-depressant medications and determine the source of his behavior issues. The behavioral component was designed to address Hill's inappropriate behavior so he could transfer to a less restrictive environment. The plan was therefore tailored to Hill's medical needs, and Hill's due process rights were not violated.

Finally, Hill's contention that he was forced to take psychotropic medications is unfounded. The record establishes Hill's treatment plan indicated discontinuance of his medication to enable medical care providers to accurately diagnose and treat Hill. Therefore, the allegation that Hill's due process rights were violated is without merit.

## CONCLUSION

The mental health treatment that Plaintiff received while he was housed in C-3 satisfied the Eighth Amendment. Further, there are no facts to suggest an Eighth Amendment violation based upon the conditions of Hill's confinement in the MHU. And finally, *Vitek* does not apply here, resulting in no due process violation. Therefore, Defendants' motions for summary judgment will be granted.

## ORDER

### NOW THEREFORE IT IS HEREBY ORDERED:

1.     Plaintiff's Motion to Amend Complaint (Dkt. 40) is **DENIED**.

2.  Plaintiff's Motion for Judicial Notice (Dkt. 42) is **DENIED**.

3.  Plaintiff's Motion for Leave to File Objection to Defendants' Replies (Dkt. 48) is **DENIED as MOOT.**

4.  Plaintiff's Motion to Appoint Counsel (Dkt. 50) is **DENIED**.

5.  Defendants' Motion to Strike (Dkt. 44) is **DENIED as MOOT**.

6.  Defendant Corizon's Motion for Summary Judgment (Dkt. 34) is **GRANTED**.

7.  The IDOC Defendants' Motion for Summary Judgment (Dkt. 37) is **GRANTED**.

8.  Defendant Lake is hereby **DISMISSED** from this action.

9.  The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would be frivolous and therefore taken in bad faith. *See Coppedge v. United States*, 369 U.S. 438, 445 (1962). For this reason, Plaintiff's in forma pauperis status is **REVOKED**. Any further request to proceed in forma pauperis on appeal should be directed on motion to the United States Court of Appeals for the Ninth Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

DATED: December 18, 2014

B. Lynn Winmill
Chief Judge
United States District Court